**STATE of Missouri, Respondent,**

v.

**Mildred SMITH, Appellant.**

**No. 61609.**

Supreme Court of Missouri, Division 2.

April 8, 1980.

Rehearing Denied May 13, 1980.

Ralph R. Bloodworth, Jr., Poplar Bluff, for appellant.

John Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for respondent.

STOCKARD, Commissioner.

Mildred Smith has appealed from the judgment entered pursuant to jury verdict whereby she was found guilty of first degree murder as then defined in § 559.010 RSMo 1969 (now repealed), and sentenced to life imprisonment.

The recital of certain procedural background is essential. Appellant was charged on October 14, 1974, with the murder of Carl Henry "Cotton" Smith, her husband. A verdict of guilty was entered on January 9, 1975. There was no timely motion for new trial, and after allocution, judgment was entered. Thereafter, what is now the Missouri Court of Appeals, Southern District, dismissed an attempted appeal. *State v. Smith*, 527 S.W.2d 455 (Mo.App.1975). On March 5, 1979, the trial court sustained appellant's motion pursuant to Rule 27.26 for the reason that appellant's attorney had not timely filed a motion for new trial, and thereby had prevented her from having a meaningful appeal. Allocution, sentence

and judgment were set aside. A motion for new trial was then filed and was denied. Allocution was again held, sentence of life imprisonment was imposed and judgment entered. It is from that judgment that this appeal has been perfected.

There is no challenge to the sufficiency of the evidence. Therefore, an abbreviated statement of the facts will be sufficient. A jury reasonably could find from the evidence that after making threats against the life of her husband and Marie Martin, with whom appellant believed her husband was having an illicit affair, appellant found her husband in a tavern where Marie Martin was employed. After about an hour appellant went to her home and obtained a rifle and then purchased ammunition for it. She returned to the tavern and purchased a few beers. She then left the tavern and her husband followed her. Immediately thereafter appellant shot her husband twice, the second time in the back, and he died almost instantly as the result of the second shot. Appellant then engaged in a fight with Marie Martin, and after others broke up that fight appellant entered the tavern and swallowed a number of pills which she had in her purse.

■ Appellant's first point is that the trial court "erred in failing to submit an instruction on manslaughter." This point is based on an assignment of error in the motion for new trial in substantially the same language. Both the assignment of error and the point are inadequate to preserve anything for appellate review under former Rule 27.20(a). See *State v. Cheek*, 413 S.W.2d 231, 238 (Mo.1967). Appellant does not urge that the contention be reviewed pursuant to former Rule 27.20(c) (present Rule 29.12) as plain error, but in view of the gravity of the offense of which appellant was found guilty, and in the exercise of our discretion we shall review this contention to determine whether there occurred plain error resulting in manifest injustice or miscarriage of justice.

■ The court gave an instruction on first degree murder, MAI–CR 6.02 and second degree murder, MAI–CR 6.06, but gave no instruction on manslaughter. This case was tried before the effective date of the requirement, as set forth in Notes on Use to MAI–CR 6.02, which made it mandatory to instruct on manslaughter when an instruction on first degree murder is given. At the time of the trial of this case the Notes on Use to MAI–CR 6.08 provided that "Where higher grades of homicide are submitted, a manslaughter instruction should not be given unless there is evidence to support the giving of it. It should not be given automatically."

Appellant does not set forth in her brief what she contends to constitute supporting evidence for the manslaughter instruction. Instead she relies on *State v. Stapleton*, 518 S.W.2d 292 (Mo. banc 1975), in which it was stated that by reason of the ruling in *State v. Ayers*, 470 S.W.2d 534 (Mo. banc 1971), "when there is evidence sufficient to submit an instruction on second degree murder, there is automatically evidence to submit manslaughter and * * * it is the function of the jury to decide whether the defendant acted with pre-meditation and malice." There is no question, in fact appellant admits, that the facts of this case authorized the submission of the instruction on first degree murder. Appellant asserts that the above quoted ruling in the Stapleton case applies equally as well to first degree murder. For the purposes of this appeal we shall assume there was evidence to support an instruction on manslaughter. This presents the issue of whether the failure to instruct on manslaughter constituted plain error resulting in "manifest injustice or miscarriage of justice."

Former Rule 20.02(e) (present Rule 28.-02(e)) provides that "Giving or failing to give an instruction * * * in violation of [that] Rule or any applicable Notes on Use shall constitute error, its prejudicial effect to be judicially determined." The jury was instructed upon both murder in the first degree and in the second degree, and they returned a verdict of guilty of first degree murder. Under the specific language of the instructions the jury was given the option to exercise leniency by convicting ap-

pellant of murder in the second degree, but it declined to do so. There is no reason to assume that if a manslaughter instruction had been given the jury would have availed itself of the manslaughter option, which would have called for even greater leniency. Under the circumstances of this case, and for the reasons set forth above, we find that the failure to give a manslaughter instruction did not result in manifest injustice or a miscarriage of justice.

Appellant's second and third points (each not in compliance with Rule 84.04(d)) challenge the admission in evidence of inculpatory statements made by her while in custody. We shall consider these two points to determine whether there occurred plain error for the same reason we reviewed the first point.

The transcript does not contain a motion to suppress the statements of appellant, and therefore the precise basis for the challenge made to the trial court is not known. The statements referred to in the second point were made by appellant to Patrolman Ronald T. Berry at the time of her arrest. From the argument in appellant's brief we find that she now contends the statements were not voluntarily made because she did not have the required capacity to voluntarily waive her rights. The trial court held a hearing out of the presence of the jury and the following facts and circumstances were developed.

Following the shooting appellant returned to the tavern, asked for a beer, and swallowed some pills which she obtained from her purse. According to a witness who was in the tavern with her, appellant walked normally, her voice was not slurred and her speech was coherent. She gave no indication of being intoxicated, nervous or upset. Patrolman Berry arrived at approximately 4:00 o'clock which was shortly after the shooting. He found the body of appellant's husband lying in the driveway. Within a "matter of minutes" appellant came out of the tavern. Patrolman Berry advised her of her constitutional rights in the form of the "*Miranda* warnings," and while he was doing so appellant interrupted and announced to him that she knew "[her] god damn rights and [she understood] them." The patrolman then asked her if she shot her husband, and she replied, "You god damn right I killed the bastard." She also volunteered statements to the effect that she was "tired" of the way her husband had been acting, and that if she could not have him no one else could. At that time, according to Patrolman Berry, there appeared to be nothing wrong with appellant except that she had been crying, but she did have an odor of alcohol on her breath. According to a deputy sheriff who arrived at the scene appellant was "talkative" and she was not "steady on her feet," but in his opinion "this was normal for her." However, another witness stated that she was steady on her feet. Dr. Gene Leroux testified that it would take "about thirty minutes" after the pills were swallowed before they would begin to affect a person, and about forty-five minutes "before one would feel a lot of effect." After the patrolman completed his investigation he noted that appellant was beginning to show signs of intoxication, and when he arrived at the hospital at 4:35 or 4:40 o'clock appellant appeared to him to be unconscious and he carried her into the emergency room. Dr. Leroux, who treated her, testified that she "appeared to be inebriated, or drunk, stuperous," but that she had not "passed out and [was not] unconscious," and she knew what was happening to her. He tried unsuccessfully to get her to drink a medication to cause her to vomit so he "took a tube * * * and washed her stomach out." Appellant testified that she remembered nothing after she left the tavern the first time (which was before the shooting) until she woke up in the jail at Poplar Bluff, and that she did not recall talking to Patrolman Berry.

The trial court ruled expressly that "the statement made by [appellant] on September 10 there at the scene as testified to by the trooper and these other witnesses and the voluntary statements that have been testified to are found to be voluntary and may be presented to the jury."

The statements referred to in appellant's third point were made by her the following morning at the hospital to Lewis Dawes, the sheriff of Ripley County. From the argument it appears that appellant contends that because of her physical and mental condition the statements were not voluntarily made.

The sheriff went to appellant's hospital room about 10:00 o'clock in the morning of September 11. He first advised her of her "constitutional rights," and she stated that she understood those rights and that she would like to talk about shooting her husband. She then asked if her husband was dead, and when told that he was, she replied, "I am glad that the bastard is dead." The sheriff testified that in answer to various questions, appellant related in detail her intention to kill her husband and the circumstances of doing so. A deputy sheriff who was present during the questioning testified that appellant "looked tired" and was "not real steady on her feet." A short time later she was taken to the magistrate court. Mrs. Maness, the magistrate judge, testified that appellant "came almost staggering into the court room," her hair was disheveled, and "she looked like she hadn't slept the night before and she seemed almost incoherent." When Judge Maness asked appellant if she had an attorney she named the Judge's husband who had been deceased for several years. However, Judge Maness testified that appellant "knew she was being arraigned on a murder charge," and if she, the judge, had not believed appellant was able to understand what the proceedings were she would not have proceeded.

Appellant again testified and repeated her previous statement that she remembered nothing after she left the tavern the first time until she woke up in jail in Popular Bluff, and that she did not remember talking to the sheriff or being in the magistrate court.

The trial court ruled expressly that the statements and admissions of appellant made in the morning of September 11 to the sheriff at the hospital were voluntarily made and could be presented to the jury.

At the trial the patrolman and the sheriff both testified without objection to the statements made to them by appellant. For what would be the usual effect of such failure to object, see *State v. Bryson*, 506 S.W.2d 358 (Mo.1974); *State v. Yowell*, 513 S.W.2d 397, 402–403 (Mo. banc 1974); and *State v. Dodson*, 551 S.W.2d 932, 936 (Mo. App.1977). Also, we note that MAI–CR 3.44, pertaining to the determination by the jury of the voluntariness of a statement made by a defendant was not requested, and was not given. This strongly indicates that as a result of the testimony which was received out of the hearing of the jury, appellant's counsel were satisfied with the ruling by the trial court that the statements were voluntarily made.

■ The statements were made while appellant was in custody and therefore the burden of establishing voluntariness by a preponderance of the evidence, *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), was on the State. *State v. Olds*, 569 S.W.2d 745 (Mo. banc 1978). There is no question but that appellant was told of her "*Miranda* rights" before she made any statement to the patrolman or to the sheriff. There is no claim that promises were made or inducements held out to get her to make the statements. There is no claim of threats or physical abuse, or that appellant made the statements because of fear. Basically appellant's claim is that because of low intelligence and intoxication she could not have understandingly waived her constitutional rights.

■ A report of a psychiatric examination, filed approximately three weeks before trial and available to the trial court, stated that appellant scored "a Full-Scale I.Q. of 78," and that this placed her "within the borderline of intelligence." It was also reported that a mental examination disclosed "no evidence of delusions or hallucinations," and that her "intelligence appeared to be within normal range," but her "insight and judgment are considered to be poor." She was found not to be suffering from mental illness or defect, and the ex-

amining doctor reported that she "does not lack the capacity to understand the proceedings against her or to assist in her own defense."

The education, mental capacity and degree of intoxication were all circumstances to be considered by the trial court in its determination whether the statements were voluntarily made. When equated precisely to this case, the issue is whether under all the attending circumstances appellant was able to understand her constitutional rights as they were related to her by the patrolman and the sheriff, and to understandingly and knowingly waive those rights if she voluntarily chose to do so. "It is generally agreed * * * that drug influence or intoxication at the time of making a statement or confession does not require exclusion because not voluntarily, knowingly and intelligently made unless the intoxication or drug influence amounts to mania. The fact of drug influence and intoxication, absent mania, only goes to the credibility and weight of the statement. Before exclusion is required, it should appear that defendant was so intoxicated or influenced that he was unable to appreciate the consequences and nature of his statements" *State v. Hindman*, 543 S.W.2d 278, 285 (Mo.App. 1976). See also *State v. Rose*, 249 S.W.2d 324 (Mo. banc 1952); *State v. Heather*, 498 S.W.2d 300 (Mo.App.1973); and the cases collected in the annotation at 69 A.L.R.2d 361. The express findings of the trial court are not clearly erroneous, and in view of the totality of all the circumstances, the admission in evidence of the statements did not constitute plain error resulting in manifest injustice or a miscarriage of justice.

As we understand appellant's fourth and final point, it is that when the trial court sustained her motion filed pursuant to Rule 27.26, it should have set aside the jury verdict of guilty instead of setting aside the judgment and permitting the filing of a motion for new trial so that an appeal could be taken from the new judgment entered subsequent to the ruling on the new motion for new trial. Appellant admits in her brief that the procedure followed by the trial court conforms with what "the law is presently," but she asserts that to be required to now appeal "with an attorney who was not present at the trial, who did not hear the witnesses testify or the trial court rule on objections made is a denial of her federal protection to an appeal," and she requests that "in the spirit of justice and fair play" her conviction either be set aside outright or that the case be remanded for a new trial.

Appellant cites no authority that supports the action requested and we know of none. The court followed the accepted procedure in this State, see *Wilson v. State*, 561 S.W.2d 749 (Mo.App.1978), and in the federal courts. See *Rodriquez v. United States*, 395 U.S. 327, 89 S.Ct. 1715, 23 L.Ed.2d 340 (1969). The action taken did not deny appellant any federally or state protected right of appeal, and she is not entitled to the relief requested.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the court.

All of the judges concur.